**SO ORDERED.**

**SIGNED this 15 day of July, 2013.**

*Stephani W. Humrickhouse*
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| QUANTUM COOL, LLC | 12-00260-8-SWH |
| DEBTOR | |

### ORDER REGARDING DEBTOR'S MOTION TO DISMISS INVOLUNTARY PETITION

The matter before the court is Quantum Cool, LLC's ("Quantum Cool") motion to dismiss the involuntary petition filed by Wanchese Fish Company, Inc. ("Wanchese"), Victor B. Matthews and Arthur M. Herman (the "Petitioning Creditors"). The motion was heard in Raleigh, North Carolina, on April 30 and May 1, 2013.

### BACKGROUND

Steve Kehrer and Mike Beacham created Quantum Cool in 2008 and remain the only two members of the company. Quantum Cool is a Delaware limited liability company and was in the business of developing thermal energy products and technologies, specifically focusing on research and development for an innovative cold storage trucking operation. However, the company is no longer in operation and has very few, if any, assets.

Wanchese is a North Carolina corporation and a fully integrated seafood business. Wanchese is owned by Daniels Enterprises, Inc., another North Carolina corporation. Daniels Enterprises, Inc., is owned by Daniels Enterprises Holding Company, Inc., a Virginia corporation. The holding company has fifteen shareholders, all of whom are members of the Daniels family. Wanchese is one of many subsidiaries owned by the holding company.

In or around 2008, an affiliate of Quantum Cool entered into a lease agreement with an affiliate of Wanchese for the use of thermal energy equipment in Wanchese's shipping operations. Based on this business relationship, Steve Kehrer, on behalf of Quantum Cool, approached Tim Daniels, a Vice President of Wanchese, around November of 2010 to discuss the possibility of Wanchese funding an expansion of Quantum Cool's business.

In December of 2010, Steve Kehrer solicited funding from Wanchese and provided Wanchese with a packet of materials, including a confidentiality agreement, an itemized list of objectives and benefits relating to a potential partnership between Quantum Cool and Wanchese, and a letter of intent relating to this partnership. See Quantum Cool's Exhibits A - C. The copy of the confidentiality agreement introduced at the hearing was executed by Mike Beacham, on behalf of Quantum Cool, and Tim Daniels, on behalf of Wanchese; however, the admitted copy of the list of objectives and the letter of intent were unsigned.

The letter of intent is accompanied by an "Attachment A," which provides in part that Wanchese will partner with Quantum Cool "in a New Company, to be named by the Partners." It states that Wanchese will provide (1) $100,000 to the "Quantum Cool Owners," (2) another $100,000 for "existing Quantum Cool obligations," and then (3) the balance of the funds for "Capitalization of Operations of the New Company." The letter of intent provides that the balance

of funds for capitalization would be $800,000, bringing Wanchese's total contributions to $1,000,000. Finally, the letter of intent states that Quantum Cool would transfer "all technologies and business assets to the New Company."

On January 19, 2011, Wanchese advanced $50,000 to Quantum Cool. See Wanchese Exhibit E. On the same day these funds were advanced, Mr. Kehrer and Mr. Beacham executed a promissory note on behalf of Quantum Cool in favor of Wanchese in the original amount of $50,000. See Wanchese Exhibit A. The note is payable within thirty days from the date demand is made by Wanchese. The payment of this note is guaranteed by Eden Labs, L.L.C. Mr. Kehrer signed the guaranty agreement as a managing member of Eden Labs, L.L.C.[1] The note states that it should be construed under the laws of the Commonwealth of Virginia.

At the time these funds were advanced, the parties continued to discuss the development of a joint venture. The discussions took place at both Wanchese's and Quantum Cool's facilities. Steve Kehrer testified that all fifteen of the Daniels family members were usually present when the meetings were held at the Wanchese facility. During these discussions, the parties decided that Quantum Cool and the Daniels family would each create their own separate entity to become an owning member of an entirely separate limited liability company serving as the operating entity for the parties' joint venture. At some time prior to February 4, 2011, the parties decided that the name of the limited liability company would be Thermic Green, LLC.

---

[1]Quantum Cool also executed a security agreement on January 19, 2011, granting Wanchese a security interest in Quantum Cool's currently owned or after-acquired property as designated in the security agreement, as well as any and all substitutions and replacements of such property, any and all accessions to such property, and any proceeds from such property. See Wanchese Exhibit C. Wanchese also filed a U.C.C. Financing Statement with the Delaware Department of State on January 21, 2011.

On February 4, 2011, Mike Beacham sent an email addressed to Tim Daniels and Mark Palmer,[2] to which Steve Kehrer was copied, purporting to set out Quantum Cool's "recommendations for proceeding with business" with the joint venture, at least until the parties were able to finalize and sign an operating agreement governing Thermic Green, LLC (the "February 4, 2011 Email"). The email summarizes the funding requests made in "Attachment A" to the letter of intent that was provided by Steve Kehrer to Wanchese during the December 2010 presentation.

The February 4, 2011 Email acknowledges that the $50,000 previously advanced from Wanchese to Quantum Cool constituted a portion of the funding for the "old" business. It also describes a "Friday Feb. 4 Payment," another request by Quantum Cool for funds from Wanchese. According to the email, Quantum Cool was requesting an additional minimum of $20,000 that would constitute a portion of the "old" business funding and $50,000 that would constitute a portion of the "new" business funding. The email states, however, that Quantum Cool "could really use" $30,000 that would constitute a portion of the "old" business funding and $70,000 that would constitute a portion of the "new" business funding. Finally, the email contains notes from Steve Kehrer itemizing the estimated costs of developing the cold storage trucking operation.

On February 4 and 9, 2011, Wanchese advanced additional funds to Quantum Cool in the total amount of $100,000.[3] See Wanchese Exhibit E. On February 9, 2011, Steve Kehrer and Mike Beacham executed another promissory note on behalf of Quantum Cool in favor of Wanchese in the

[2]Mark Palmer was the chief financial officer of Daniels Enterprises Holding Company, Inc., until around mid-February of 2011.

[3]On February 4, 2011, Wanchese advanced $10,000 to Quantum Cool, and on February 9, 2011, Wanchese advanced another $90,000. See Wanchese Exhibit E.

original amount of $100,000.  See Wanchese Exhibit B.  Similar to the note executed on January 19, 2011, this note is also payable within thirty days from the date demand is made by Wanchese, its payment is also guaranteed by Eden Labs, L.L.C, and the note is to be construed pursuant to Virginia law.  When the February 9, 2011, note was executed, the parties had not yet finalized or signed an operating agreement that would govern Thermic Green, LLC.  In fact, the parties had not yet registered Thermic Green, LLC, under the laws of any state nor had they formed the entities that would eventually serve as the members of Thermic Green, LLC.

Steve Kehrer testified that, after discussions with Mark Palmer and Mike Beacham, it was suggested that Mr. Kehrer be responsible for forming Thermic Green, LLC.  On February 21, 2011, Mr. Kehrer created and registered Thermic Green, LLC, under the laws of Delaware (the "Delaware Thermic Green").  Mr. Kehrer then opened a bank account for the Delaware Thermic Green.  He testified that Tim Daniels and another employee of the Daniels Enterprises Holding Company, Inc., had access to this account.  Mr. Kehrer also formed Thermic Solutions, LLC, which is the entity that would serve as one of the members of Thermic Green, LLC.  He and Mike Beacham are the members of Thermic Solutions.  It is unclear, however, from the evidence when Thermic Solutions was created.

On March 14, 2011, the Daniels family created and registered Cool D, Inc. ("Cool D") with the North Carolina Secretary of State to serve as the other owning member of Thermic Green, LLC.  See Wanchese Exhibit H.  According to the testimony of Joey Daniels, Cool D's officers consist of himself, Tim Daniels and Kenneth Todd Daniels.[4]  However, all fifteen of the Daniels family members are shareholders of the company.  On March 16, 2011, two days after Cool D was

---

[4]Joey Daniels is an officer of both Wanchese and Cool D.

5

registered and almost one month after Steve Kehrer registered Delaware Thermic Green, the Daniels family formed their own Thermic Green, LLC, under the laws of North Carolina (the "North Carolina Thermic Green"). According to Steve Kehrer's testimony, he was unaware, for at least some period of time, that the Daniels family had decided to form North Carolina Thermic Green. Accordingly, as of March 16, 2011, there were two separate entities with the organization name Thermic Green, LLC, one formed by Steve Kehrer in Delaware and the other formed by the Daniels family in North Carolina.[5]

It is unclear how Cool D and North Carolina Thermic Green fit, if at all, within the corporate structure of Daniels Enterprises Holding Company, Inc. Ms. McChesney is the current chief financial officer of Daniels Enterprises Holding Company, Inc., and has held this position since June of 2012. According to her testimony, she is extremely familiar with the holding company's corporate structure and Cool D is not one of its subsidiaries. In fact, she had no knowledge of Cool D's existence until around September of 2012. Ms. McChesney also stated that the holding company maintains detailed and accurate records for all of its subsidiaries, and she is not aware of any records maintained by or for Cool D. She also lacks any knowledge of whether Cool D owns any assets or maintains any bank accounts. No testimony regarding the existence of records on North Carolina Thermic Green was provided by Ms. McChesney.

During the creation and registration of all of these entities—Thermic Solutions, Delaware Thermic Green, Cool D, and North Carolina Thermic Green—the parties continued to negotiate the

---

[5]For convenience, the entity created by Mr. Kehrer will be referred to as Delaware Thermic Green and the entity created by the Daniels family as North Carolina Thermic Green. Finally, the court refers more generally to Thermic Green, LLC, as the entity that all parties intended to serve as the operating entity for their joint venture.

terms of an operating agreement that would govern Thermic Green, LLC. Steve Kehrer testified that he had significant discussions with the Daniels' attorney over the terms of the operating agreement and that many revisions were made. Ultimately, there appears to be no dispute that the parties signed a final version of an operating agreement on March 29, 2011, at Wanchese's facility. Although Mr. Kehrer testified that it was always his intent to do business under the Delaware Thermic Green, he conceded that the final signed version of the operating agreement might relate to the North Carolina Thermic Green.[6]

Unfortunately, however, although the parties acknowledge that an operating agreement was signed, an undisputed final version of the operating agreement, executed on March 29, 2011, was not submitted into evidence. Rather, an operating agreement dated March 16, 2011 (the "March 16 Agreement") was introduced. See Quantum Cool Exhibit E; Wanchese Exhibit G. The March 16 Agreement relates to the North Carolina Thermic Green, not the Delaware Thermic Green. It also provides that Cool D is a member of the company, holding a 51% interest, and that Thermic Solutions is the other member, holding a 49% interest. The agreement contains a signature page which contains the signature of Tim Daniels on behalf of Cool D and the signature of Steve Kehrer on behalf of Thermic Solutions. The signatures of Tim Daniels, Joey Daniels, Kenneth Todd Daniels, Steve Kehrer and Mike Beacham are also included on this page in their capacities as managers of Thermic Green, LLC. There are no signatures by any of the Daniels family members

---

[6]Mr. Kehrer seemed to contradict himself at times during his testimony when discussing which entity the final operating agreement controlled. Initially, he testified that the final agreement referenced the Delaware Thermic Green. At one point during his testimony, however, he stated that when the final agreement was signed the parties were still in discussions as to whether it governed the Delaware Thermic Green or the North Carolina Thermic Green. Finally, Mr. Kehrer testified that the final agreement might have referenced the North Carolina Thermic Green.

in their capacities as officers of Wanchese nor are there any signatures by Steve Kehrer or Mike Beacham in their capacities as members of Quantum Cool.

Steve Kehrer could not confirm that the March 16 Agreement contained all of the terms that were included in the final version of the parties' operating agreement, stating that he had not had enough time to review the document introduced prior to testifying. He noted that the final agreement was executed on March 29, 2011, and that he remembers initialing the margins of every page to the final version of the agreement, and that the March 16 Agreement did not have his initials. Mr. Kehrer did state, however, that the terms included within Exhibit D of the March 16 Agreement were the same terms contained in the final agreement. See Quantum Cool Exhibit E. Exhibit D is entitled "Funding Schedule for Initial Capital Contributions by Cool D" and purports to set out the capital contributions that Cool D agreed to contribute to Thermic Green, LLC. Subsection (a) of the funding schedule provides, in pertinent part:

> Funding Schedule. Initial capital contributions shall be made by Cool D as follows:
>
> (a) Toward Completion of Prototype. Cool D shall contribute toward the bona fide costs of the Company's operations, as needed, Four Hundred Thousand United States Dollars ($400,000.00) to enable the Company to build a prototype of a Super Refrigerated Transport Vehicle (the "Vehicle") that the Company believes can successfully pass testing at North Carolina State University. *Any loans previously made by Cool D's affiliates to Quantum Cool, LLC shall be considered part of said $400,000 to the extent that such amounts are converted to contributions to capital*. . . (emphasis added).

Subsections (b) and (c) of the funding schedule provide that Cool D shall contribute an additional $200,000 and $400,000 to Thermic Green, LLC, if certain conditions are satisfied.

Based on this agreement, and the parties' discussions, Steve Kehrer testified that the $150,000 advanced from Wanchese to Quantum Cool on January 19, February 4 and February 9,

2011, were a part of the initial $400,000 that Cool D was required to contribute to Thermic Green, LLC, pursuant to the operating agreement.  According to Mr. Kehrer, the parties had always intended for Quantum Cool's $150,000 obligation to Wanchese to be converted to capital once the operating agreement was finalized and signed.  Ms. McChesney testified, however, that in order for Wanchese to forgive this debt or convert it into a capital contribution, the board of directors for either Wanchese or the Daniels Enterprises Holding Company, Inc, would have had to pass a resolution to that effect.[7]  She is unaware of any such resolution ever being made by either board or that either company has ever discussed taking this type of action since she began serving as chief financial officer.  Ms. McChesney did acknowledge, however, that corporate minutes were not always maintained for the companies' board meetings, at least those occurring prior to the time she became chief financial officer in June 2012.  Finally, Ms. McChesney testified that Wanchese's accounting records do not contain any entries indicating that it had assigned this debt to Cool D or that it had somehow converted it into a capital contribution to Thermic Green, LLC.

Shortly after the meeting that was held on March 29, 2011, during which the final operating agreement was signed, the parties' relationship quickly declined eventually resulting in the termination of their joint venture.  The reason for this breakdown is disputed.  According to Steve Kehrer, he requested an immediate contribution of $83,000 for general operating expenses, and Tim Daniels agreed to deposit this amount into the bank account[8] on the following day.  Mr. Kehrer then

---

[7]The board of directors for Wanchese are the same board of directors for Daniels Enterprises Holding Company, Inc., i.e., the fifteen Daniels family members, including but not limited to Tim Daniels, who signed the operating agreement on behalf of Cool D and as a manager of Thermic Green, LLC.

[8]It is unclear from the testimony of either Steve Kehrer or Joey Daniels to what bank account the parties were referring when discussing this contemplated transaction.

testified that no such funds were ever deposited.  Instead of making the deposit, the Daniels family members held a board meeting for Thermic Green, LLC, without the presence of Steve Kehrer or Mike Beacham.  Mr. Kehrer testified that Tim Daniels then approached him about inserting additional provisions into the operating agreement that would further restrict Mr. Kehrer's ability to use any funds.  This, according to Mr. Kehrer, is when the parties decided to "amicably part ways," and as of April 1, 2011, the parties did just that.

Joey Daniels testified to a different story.  According to his understanding, he was to deposit a total of $16,000 shortly after the meeting on March 29, 2011.  On cross-examination, he first testified that this money was to be funded by Wanchese, but later on re-direct examination, he stated that the money would not have gone directly from Wanchese to Thermic Green, LLC, but would have been transferred through Cool D as provided for in the operating agreement.  The money was never advanced, however, because Cool D discovered that a deposit of $20,000 had been made to the operating account from an undisclosed source.  This was of great concern to the Cool D members because they did not know what other parties were funding Thermic Green, LLC, or what other liabilities Steve Kehrer was incurring on behalf of the company.  According to Joey Daniels, therefore, it was this undisclosed funding from a third party that ultimately caused the parties' relationship to deteriorate, leading to the termination of the joint venture.

Wanchese entered into evidence an email exchange occurring on April 1, 2011, between Mike Beacham and another employee of Wanchese.  See Wanchese Exhibit K. In this email, the employee inquires into the details of a $20,000 deposit made into a bank account on March 31, 2011.  In response, Mr. Beacham states that he and Steve Kehrer borrowed money from a third party because the contract with Wanchese remained unfunded and that the "the current changes in funding

procedures to Thermic Green were unacceptable." Mr. Beacham also stated in the email that he had talked to Tim Daniels about what the parties should do with respect to the money that had already been advanced by Wanchese to Quantum Cool. He wrote that "all money advanced by Wanchese on behalf of Thermic Green" would be paid back.

There was no evidence regarding what transpired in the interim, but on August 23, 2011, the Daniels' attorney sent a demand letter addressed to Steve Kehrer for the repayment of the January 19, February 4 and February 9, 2011, promissory notes executed by Quantum Cool in favor of Wanchese. Such notes were not repaid, and the Petitioning Creditors filed the involuntary case on January 12, 2012, pursuant to Section 303(b).[9] Quantum Cool filed its answer to the petition on April 26, 2012. Within its answer, Quantum Cool requests an order dismissing the involuntary petition and awarding damages against the Petitioning Creditors pursuant to Section 303(i)(1) for reasonable costs and attorneys' fees incurred in relation to this matter. Quantum Cool also seeks an award of punitive damages against the Petitioning Creditors pursuant to Section 303(i)(2), arguing that Wanchese filed this petition in bad faith.[10]

Section 303(b) provides, in pertinent part, that:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title —

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $14,425 more than the

---

[9]All section references, unless otherwise indicated, are to the Bankruptcy Code.

[10]The motion to dismiss was not heard until just over one year after the filing of Quantum Cool's answer. The delay resulted from repeated motions to continue the hearing filed by both parties. The court granted the motions based on representations made by the parties that a settlement would be reached.

value of any lien on property of the debtor securing such claims held by the holders
of such claims;

       (2) if there are fewer than 12 such holders, excluding any employee or insider
of such person and any transferee of a transfer that is voidable under section 544,
545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold
in the aggregate at least $14,425 of such claim[.]

11 U.S.C. § 303(b)(1)-(2).[11]  Section 303(h) provides, in pertinent part, that if the petition is

controverted by the debtor, then a court shall order relief against the debtor *only if* "the debtor is

generally not paying such debtor's debts as such debts become due unless such debts are the subject

of a bona fide dispute as to liability or amount[.]" 11 U.S.C. § 303(h)(1).

       Wanchese was the only Petitioning Creditor to appear at the hearing on Quantum Cool's

motion to dismiss.  However, the parties have stipulated to the limitation of the issues before the

court as follows: (1) whether Quantum Cool's liability to Wanchese is subject to a bona fide

dispute[12] and (2) whether Wanchese filed the petition in bad faith.[13]

---

[11]For involuntary petitions filed on or after April 1, 2013, the aggregate amount of a claim(s)
necessary to qualify as a petitioning creditor(s) is $15,325.  However, when the involuntary petition
in the present case was filed, i.e., January 12, 2012, the aggregate amount was set at $14,425.

[12]The language of Section 303 requires a court to determine whether the claim is the "subject
of a bona fide dispute as to liability *or amount*" (emphasis added).  Congress added the language "as
to liability or amount" in 2005, which has caused disagreement among courts over "whether a
dispute with respect to any portion of the claim, even if an amount above $14,425 is left undisputed,
disqualifies the entire claim for § 303(b) purposes." In re Roselli, 2013 Bankr. LEXIS 830, at *24
(Bankr. W.D.N.C. Mar. 6, 2013).  However, that precise issue is not before the court because
Quantum Cool is contesting its liability with respect to Wanchese's entire $150,000 claim.

[13]The parties have stipulated that Quantum Cool has fewer than twelve claimants and thus
only one eligible creditor is necessary for purposes of Section 303(b).  Quantum Cool also conceded
that it has little or no assets to secure Wanchese's claim, and thus no issue exists under
Section 303(b) regarding whether Wanchese, as the only creditor to appear before the court, has a
claim that is "at least $14,425 more  than the value of any lien on property of the debtor securing
such claim[.]"  Finally, Quantum Cool acknowledged that it has not paid Wanchese any amount on
the notes after demand was made.  By expressly limiting the issues to the existence of a bona fide
dispute and the presence of bad faith, Quantum Cool appears to concede that if Wanchese's claim

The term "bona fide dispute" is not defined in the Bankruptcy Code, but the Fourth Circuit has stated that it "clearly entails some sort of meritorious, existing conflict." Platinum Financial Services Corp. v. Byrd (In re Byrd), 357 F.3d 433, 437 (4th Cir. 2004) (quoting Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d 709, 715 (4th Cir. 1993)).  It "requires an objective basis for either a factual or a legal dispute as to the validity of [the] debt." Id. (quotations and citations omitted).  More specifically, "a bona fide dispute exists only when there are substantial factual or legal questions that bear upon the debtor's liability." Id. (citing Matter of Busick, 831 F.2d 745, 750 (7th Cir. 1987)).

A "bankruptcy court need not resolve the merits of the bona fide dispute, but simply determine whether one exists." Byrd, 357 F.3d at 437.  However, as one court stated:

> a bankruptcy court is not prohibited from addressing the legal merits of the alleged dispute, but may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists. A debtor may not successfully oppose an involuntary petition by merely claiming that a legal dispute exists when in fact the applicable law is well-established and not subject to legitimate dispute.

Marketing & Creative Solutions, Inc. v. Scripps Howard Broadcasting Co. (In re Marketing & Creative Solutions, Inc.), 338 B.R. 300, 305 (B.A.P. 6th Cir. 2006) (citation omitted)).

The initial burden rests on the petitioning creditor to present sufficient evidence establishing a prima facie case that no bona fide dispute exists.  Byrd, 357 F.3d at 438.  Once the creditor establishes a prima facie case, the burden shifts to the debtor to demonstrate the existence of a bona

---

is not subject to a bona fide dispute, then Section 303(h) is satisfied and that there is no remaining issue with respect to whether it had been generally paying its debts as they become due at the time the petition was filed. See, e.g., In re Euro-American Lodging Corp., 357 B.R. 700, 713 (S.D.N.Y. 2007) (collecting cases supporting the proposition that "[t]he failure to pay just one significant creditor can support a finding that the debtor is generally not paying its debts") (quotations omitted).

fide dispute. Id. at 439. Mere contentions, by themselves, are not enough to show the existence of a bona fide dispute; rather, the debtor must produce sufficient evidence demonstrating the existence of a bona fide dispute in order to satisfy its burden. See id. at 439-40 (holding that debtor did not satisfy its burden of demonstrating the existence of a bona fide dispute and stating that debtor failed to offer "any evidence to support his contention that a bona fide dispute exists"); see also Bartmann v. Maverick Tube Corp., 853 F.2d 1540, 1544 (10th Cir. 1988) ("[T]o compel dismissal of an involuntary petition, the debtor must present proof of a bona fide dispute once the burden shifts because 'otherwise, any debtor could defeat an involuntary petition . . . by merely asserting that a bona fide dispute exists.'" (quoting In re Taylor, 75 B.R. 682, 684 (N.D. Ill. 1987)).

Wanchese has satisfied its burden of establishing a prima facie case that no bona fide dispute exists as to its claim against Quantum Cool. It entered into evidence, through the testimony of both Steve Kehrer and Joey Daniels, the promissory notes executed by Quantum Cool in favor or Wanchese. The total amount owed pursuant to these notes is $150,000. Wanchese also submitted into evidence the security agreement, bank statements evidencing the advances made by Wanchese, as well as the demand letter sent by the Daniels' attorney to Steve Kehrer. Finally, Mr. Kehrer conceded during his testimony that Quantum Cool has not repaid these amounts despite demand being made. The burden, therefore, shifted to Quantum Cool to produce sufficient evidence demonstrating that Wanchese's claim was subject to a bona fide dispute.

Quantum Cool contends that the parties, when discussing the terms of the joint venture, had always intended for the $150,000 advanced by Wanchese to Quantum Cool to be a part of the overall $1,000,000 funding agreement for Thermic Green, LLC. Quantum Cool points to Exhibit D of the operating agreement and argues that the $150,000 obligation was converted to a capital contribution.

14

That is, the obligation became a portion of the $400,000 that Cool D was immediately required to contribute to Thermic Green, LLC, pursuant to the operating agreement. Quantum Cool argues that the Daniels family, however, ultimately breached the operating agreement by reneging on its promise to provide funding in the total amount of $1,000,000 to Thermic Green, LLC. Based on these events, Quantum Cool argues that a bona fide dispute exists based on four legal theories: (1) modification of the loans, (2) a defense under Section 25-3-117 of the North Carolina General Statutes,[14] (3) waiver of the right to enforce the notes, and (4) the right to a setoff based on breach of the operating agreement.

The court must first determine whether Quantum Cool has presented sufficient evidence to satisfy its burden that a bona fide dispute exists over whether the obligations pursuant to the promissory notes were modified by an agreement between Wanchese and Quantum Cool to convert the debt into capital. In support of its modification argument, Quantum Cool contends that the promissory notes were modified by (1) the parties' discussions over funding Thermic Green, LLC, as well as (2) the operating agreement itself. The promissory notes, however, contain the following provision:

> Section 3.15. *Entire Agreement*. Except as may otherwise be specifically provided herein, this Note, the Security Agreement, and any other documents referred to

---

[14]Although Quantum Cool cites N.C.G.S. § 25-3-117 as a basis for an affirmative defense, Section 3.2 of the promissory notes, entitled "Governing Law," states that the notes "shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without reference to that state's choice of law rules." See Wanchese Exhibits A and B. Therefore, whether Quantum Cool has valid defenses to the enforcement of the notes is determined in accordance with Virginia law. See Va. Code § 8.1A-301(b) ("Except as otherwise provided in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or such other state or nation shall govern their rights and duties."); see also Va. Code § 8.3A-117 (containing language identical to the language under N.C.G.S. § 25-3-117).

therein constitute the entire agreement of the parties with respect to the debt owed by Maker to Payee, and all prior representations, covenants, proposals and understandings, whether written or oral, not contained in such documents are superseded and merged herein. This Note may be modified or amended only by an instrument in writing executed by the parties hereto and specifically stating that it is intended as a modification or amendment to this Note. No oral statements or representations not contained herein shall have any force or effect.

See Wanchese Exhibits A and B.

Quantum Cool's argument that the notes were modified by the operating agreement relating to Thermic Green, LLC, is unpersuasive. Even assuming that a final version of the agreement exists which contains a provision that "[a]ny loans previously made by Cool D's affiliates to Quantum Cool, LLC shall be considered part of said $400,000 to the extent that such amounts are converted to contributions to capital," there was no evidence suggesting that this agreement was signed by either Wanchese or Quantum Cool. In fact, while the March 16 Agreement contains signatures of Tim Daniels, on behalf of Cool D, and Steve Kehrer, on behalf of Thermic Solutions, no party has specifically signed that agreement on behalf of Wanchese or Quantum Cool. Accordingly, there is no basis to contend that the operating agreement modified the $150,000 debt owed to Wanchese by converting it into capital contributions to Thermic Green, LLC without totally disregarding the corporate separateness of Wanchese and Cool D.[15]

_____

[15]As previously explained, Ms. McChesney did testify that, while the holding company maintains detailed and accurate records for all of its subsidiaries, she is not aware of any records maintained by or for Cool D. Further, Joey Daniels stated at one point during his testimony that Wanchese was the entity that would fund the $16,000 advance which was supposed to occur after the meeting held on March 29, 2011. This evidence brings into question the Daniels family's adherence to corporate formalities with respect to Cool D, which could potentially provide a basis for ignoring the corporate separateness of Wanchese and Cool D. However, the court need not inquire into this possibility because, as explained below, Wanchese's claim against Quantum Cool is the subject of a bona fide dispute even while recognizing Wanchese and Cool D as two separate business entities.

16

However, after a limited inquiry into Virginia law, Quantum Cool's argument that the notes were modified by the parties' discussions may have merit and at least present a significant factual dispute.  The evidence was insufficient to show the existence of a written document signed by Wanchese that could potentially serve as a written modification to the notes, i.e., a written document manifesting Wanchese's intent to convert the debt into capital contributions.  The evidence was sufficient, however, for the court to find that a genuine  issue of fact exists as to whether the parties agreed throughout their discussions to convert this debt into capital, even if such agreements were merely oral agreements occurring within the parties' discussions or merely implied agreements deriving from the parties' course of dealing.

Specifically, Steve Kehrer testified that such agreements were in fact made by the parties, and that it was always the parties' intent to eventually convert Quantum Cool's debt into capital contributions by Cool D to Thermic Green, LLC.  The evidence also suggests that a final version of the Thermic Green, LLC, operating agreement exists, that this operating agreement contains an "Exhibit D"  which appears to convert the debt owed to Wanchese by Quantum Cool into a capital contribution to Thermic Green, LLC, and that this operating agreement was signed by officers of Cool D and Thermic Solutions.  More specifically, the evidence suggests that at least two of Cool D's officers who signed the agreement, Tim and Joey Daniels, were also officers of Wanchese at the time.  It is unlikely that they would have signed an agreement, which purported to convert the debt owed to Wanchese by Quantum Cool into a capital contribution to Thermic Green, LLC, if an agreement between Wanchese and Quantum Cool to convert the debt did not actually exist.  Accordingly, the evidence is sufficient to create a factual dispute as to whether the parties agreed throughout their discussions that the $150,000 debt would eventually be converted into capital

contributions. The question, however, is whether such an agreement, which the court can only conclude occurred orally or through the parties' course of dealing, is legally enforceable to modify the notes given the language contained in Section 3.5 of such notes.

To the extent that any oral agreements were made prior to, or contemporaneous with, the execution of the promissory notes, such agreements would not be admissible to show that the parties agreed to convert the notes into capital. Section 3.15 of the notes contains a merger clause, and a limited inquiry into Virginia law reveals that such clauses will bar the introduction of prior or contemporaneous parol agreements. See Va. Code § 8.3A-117 (providing that separate agreements occurring prior to or during the same transaction giving rise to the obligation may be a defense to the obligation, but such agreements are subject to "applicable law regarding exclusion of proof of contemporaneous or previous agreements");[16] see also Wachovia Bank, N.A. v. Dresdner (In re Brookland Park Plaza, LLC), 2009 Bankr. LEXIS 3241, at *18 (Bankr. E.D. Va. Oct. 13, 2009) (stating the parol evidence rule barring prior or contemporaneous oral agreements is well-settled in Virginia and is particularly applicable "where the written agreement contains an integration or merger clause") (quotations omitted).[17]

However, Virginia law is less settled when it comes to the enforceability of agreements to modify promissory notes that occur subsequent to the execution of such notes, whether it be by a

---

[16]Although not argued by the parties, the promissory notes appear to satisfy the requirements of a "negotiable instrument," as that term is defined under Section 8.3A-104 of the Virginia Code. The notes, therefore, are governed by Title 8.3A of Virginia's Uniform Commercial Code. See Va. Code § 8.3A-102(a).

[17]A recognized exception to the parol evidence rule is in cases involving fraud. Dresdner, 2009 Bankr. LEXIS 3241, at *21-22 (citing J.E. Robert Co. v. J. Robert Co., 231 Va. 338, 343, 343 S.E.2d 350 (Va. 1986)). However, Quantum Cool has made no allegations, nor have they presented any evidence, suggesting that Wanchese has engaged in any type of fraudulent activity.

18

subsequent oral agreement or by the parties' subsequent course of dealing.  Section 8.3A-305(a)(2)

of the Virginia Code provides that "the right to enforce the obligation of a party to pay an instrument

is subject to . . . a defense of the obligor . . . that would be available if the person entitled to enforce

the instrument were enforcing a right to payment under a simple contract[.]"[18]  Turning to available

defenses under a "simple contract," the Supreme Court of Virginia has stated the following

regarding subsequent modifications to a written contract:

> We have held that a contract in writing may be modified by a new oral
> contract.  In <u>Zurich General Accident & Liability Ins. Co. v. Baum</u>, 159 Va. 404,
> 409, 165 S.E. 518, 519 (1932), we stated:
>
>> 'A contract in writing, but not required to be so by the statute of frauds, may
>> be dissolved or varied by a new oral contract, which may or may not adopt as part
>> of its terms some or all of the provisions of the original written contract . . . . *Nor
>> does it make any difference that the original written contract provided that it should
>> not be substantially varied except by writing.*  This stipulation itself may be
>> rescinded by parol and any oral variation of the writing which may be agreed upon
>> and which is supported by a sufficient consideration is by necessary implication a
>> rescission to that extent.'
>
> Additionally, modification of a contract must be shown by clear, unequivocal and
> convincing evidence, direct or implied.  <u>Stanley's Cafeteria, Inc. v. Abramson</u>, 226
> Va. 68, 73, 306 S.E.2d 870, 873 (1983).
>
> *We have also held that contracting parties, through a course of dealing, may
> evince a mutual intent to modify the terms of their contract.*  The circumstances
> surrounding the conduct of the parties must be sufficient to support a finding of
> mutual intention that the modification be effective and such intention must be shown

---

[18]The defenses under Section 8.3A-305(a)(2) are not available against a holder in due course
of the negotiable instrument.  <u>See</u> Va. Code § 8.3A-305(b) ("The right of a holder in due course to
enforce the obligation of a party to pay the instrument . . . is not subject to defenses of the obligor
stated in subsection (a)(2) [of Section 8.3A-305][.]"  However, Wanchese is not a "holder in due
course" of the promissory notes as that term is defined in Section 8.3A-302.  <u>See</u> Va. Code § 8.3A-
302 cmt. 4 (explaining the limited circumstances in which a payee may properly be considered a
holder in due course, but stating that "[i]n the typical case the holder in due course is not the payee
of the instrument").

by clear, unequivocal, and convincing evidence, direct or implied.  Id. (emphasis added).

Reid v. Boyle, 259 Va. 356, 369-70, 527 S.E.2d 137, 144-45 (2000); see also Lindsay v. McEnearney Assocs., Inc., 260 Va. 48, 53, 531 S.E.2d 573, 576 (2000). But see Sun Hotel v. SummitBridge Credit Investments III, LLC, 2013 Va. Cir. LEXIS 4, at *21-23 (Fairfax County Jan. 23, 2013) (distinguishing the principle of law established in Reid in context of a written guaranty agreement, but relying heavily on the precise language contained in the written agreement, the fact that the contract was covered by Virginia's statute of frauds, and that the guarantors did not establish a subsequent oral modification by "clear, unequivocal and convincing evidence").[19]

Based on Virginia case law, therefore, written contracts may be modified by subsequent parol agreement, or by the parties' course of dealing, even if the contract provides that any modification or amendment must be in writing.  Accordingly, in the instant case there appears to be a genuine legal issue as to whether the parties' alleged agreements and course of dealing occurring after execution of the notes would be legally enforceable to modify the notes, despite the language contained in Section 3.5.  See In re Lough, 57 B.R. 993, 997 (E.D. Mich. 1986) (providing that a bona fide dispute exists if the court would be required to resolve a "substantial dispute as to the

---

[19]The law is clear in Virginia that if the written contract falls within the statute of frauds, then the principle established in Reid, i.e., written contracts, even those containing prohibitions against oral modifications, may under certain circumstances be modified by parol agreement, does not apply.  See Lindsay, 260 Va. at 53, 531 S.E.2d at 576 (stating that the principle discussed in Reid "does not apply to an agreement which must be in writing to satisfy Code § 11-2").  Further, the law is also clear that if a contract is required to be in writing pursuant to Virginia's statute of frauds, then any modifications thereto must also be in writing.  Id. ("[W]e hold that when, as here, a contract is required to be in writing pursuant to Code § 11-2, any modification to that contract must also be in writing and signed by the party to be charged or his agent.").  However, the notes at issue in the instant case, which are payable within thirty days of demand by Wanchese, do not appear to fall within Virginia's statute of frauds.  See Va. Code § 11-2 (listing contracts required to be in writing).

proper application of law"); see also Byrd, 357 F.3d at 437 ("[A] bona fide dispute exists only when there are substantial factual *or legal questions* that bear upon the debtor's liability.") (emphasis added). While it may be difficult for Quantum Cool to prove the alleged modification by "clear, unequivocal, and convincing evidence," for purposes of a bona fide dispute it only needed to produce evidence sufficient to show that a genuine factual or legal issue exists as to its liability on the notes. There was sufficient evidence to create a factual dispute as to whether the parties modified the notes, by converting the debt to capital, through either a subsequent oral agreement or their course of dealing. Further, based on a limited analysis of Virginia law, there is a genuine legal issue over whether the alleged agreements and conduct would, as a matter of law, be enforceable to modify the notes. Both of these issues bear on Quantum Cool's liability to Wanchese. Accordingly, the evidence was sufficient to create a bona fide dispute as to Wanchese's claim, and the involuntary petition must be dismissed.[20]

While Quantum Cool has satisfied its burden of showing that a bona fide dispute exists as to its liability on Wanchese's claim, it has not demonstrated that the petition was filed in bad faith. "To determine bad faith, a court examines whether a reasonable person would have filed the petition (objective test) as well as the motivations of the petitioner (subjective test)." Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d 709, 716 (4th Cir. 1993). This is a totality of the circumstances test. In re Roselli, 2013 Bankr. LEXIS 830, at *29 (Bankr. W.D.N.C. Mar. 6, 2013). The "'filing is presumed to be in good faith, and the existence of bad faith must be proven by the

---

[20]Because the court finds that a bona fide dispute exists based on Quantum Cool's modification argument, it is unnecessary to determine whether a dispute exists based on Quantum Cool's alternative legal theories.

debtor by a preponderance of the evidence.'" Id. (quoting In re United States Optical, Inc., 1993 U.S. App. LEXIS 6960, at *10 (4th Cir. Apr. 1, 1993)).

Quantum Cool has not satisfied its burden of showing either objective or subjective bad faith. Objectively, the evidence is insufficient to indicate that Wanchese failed to make a reasonable inquiry into whether the involuntary petition was warranted under the circumstances. Subjectively, the evidence is insufficient to show that Wanchese filed the petition with an improper motive. Quantum Cool argues that the sole purpose of the petition was for debt collection, an improper purpose for bankruptcy. See Bethlehem Steel Corp., 986 F.2d at 716 n. 11. ("Debt collection is not a proper purpose of bankruptcy.") (citations omitted). However, Wanchese responds stating that the petition was filed not simply to collect a debt, but to invoke the remedies available under the Bankruptcy Code, such as a trustee's causes of action under chapter 5 of the Code. This proffered reason is supported by the evidence demonstrating that Quantum Cool is no longer an operational business and no longer has any significant assets to satisfy its creditors. Invoking the remedies available under the Bankruptcy Code to preserve or recover any potential assets available for satisfaction of a past-due debt is not an improper use of the bankruptcy system. See In re Tucker, 2010 Bankr. LEXIS 3971, at *39 (Bankr. N.D. W. Va. Nov. 21, 2010) (stating that "a desire to recover fraudulent transfers" is a permissible use of the bankruptcy process). Because Quantum Cool has failed to demonstrate bad faith, punitive damages will not be awarded. See 11 U.S.C. § 303(i)(2) (giving court discretion to award punitive damages against a petitioner that filed a petition in bad faith).

Quantum Cool also requests, however,  an order awarding reasonable attorney's fees and costs incurred as a result of defending the involuntary petition. See 11 U.S.C. § 303(i)(1) (giving

court discretion to award costs and a reasonable attorney's fee regardless of whether petition was filed in bad faith).  Section 303(i) sets out two prerequisites before a court may award fees and costs: first, the petition must have been dismissed on some ground other than consent by the parties; second, the debtor must not have waived its right to recovery under the statute.  Higgins v. Vortex Fishing Sys. (In re Vortex Fishing Sys.), 379 F.3d 701, 705-06 (9th Cir. 2004).  In the instant case, neither party has consented to dismissal and there is no indication, nor have the Petitioning Creditors alleged, that the debtor waived its right to a recovery under Section 303(i).  The prerequisites therefore have been satisfied.

While Section 303(i) permits an award of fees and costs, it does not provide a standard for courts to apply when determining whether to make such an award.  See Higgins, 379 F.3d at 706 (stating that Section 303(i) provides the court with discretion to award such fees and costs, but neither the language of the statute nor the legislative history "provide any indication of how a bankruptcy court is supposed to wield that discretion").  However, most courts apply a totality of the circumstances test.  See, e.g., id.; Rosenberg v. DVI Receivables, XIV, LLC (In re Rosenberg), 471 B.R. 307, 317 (Bankr. S.D. Fl. 2012); In re Skyworks Ventures, Inc., 431 B.R. 573, 576 (Bankr. D.N.J. 2010); In re Scrap Metal Buyers of Tampa, Inc., 233 B.R. 103, 110 (M.D. Fla. 2000).

In applying this test, some courts begin with a rebuttable presumption that the debtor is entitled to an award of reasonable fees and costs when the petition is dismissed on grounds other than the parties' consent.  Higgins, 379 F.3d at 707 ("[W]hen an involuntary petition is dismissed on some ground other than consent of the parties and the debtor has not waived the right to recovery, an involuntary debtor's motion for attorney's fees and costs under § 303(i)(1) raises a rebuttable presumption that reasonable fees and costs are authorized.") (citing In re Scrap Metal Buyers of

23

Tampa, 233 B.R. at 162); Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.), 475 B.R. 585, 598 (E.D. Mich. 2012); In re Diloreto, 388 B.R. 637, 647-48 (Bankr. E.D. Pa. 2008); In re Fox, 171 B.R. 31, 33 (Bankr. E.D. Va. 1994). This is simply a presumption that fees and costs are authorized; the evidentiary burden of showing the reasonableness of the requested fees and costs remains on the debtor. See Diloreto, 388 B.R. at 648 (stating that the "burden falls upon the petitioning creditor(s) to justify that an award of fees is inappropriate [but] . . . the evidentiary burden to establish the reasonableness of the amount awarded rests upon the putative debtor"). Accordingly, after the debtor demonstrates that the fees and costs are reasonable, the petitioning creditor has the burden "to establish, under totality of the circumstances, that factors exist which overcome the presumption, and support disallowance of fees." Higgins, 379 F.3d at 707 (citing In re Scrap Metal Buyers of Tampa, 233 B.R. at 162).

When examining the totality of the circumstances, courts should consider the "relative culpability among the petitioners, the motives or objectives of individual petitioners in joining in the involuntary petition, the reasonableness of respective conduct of the debtors and petitioners, and other individualized factors." Sofris v. Maple-Whitworth, Inc. (In re Maple-Whitworth, Inc.), 556 F.3d 742, 745-46 (9th Cir. 2009); Rosenberg, 471 B.R. at 317; see also Higgins, 379 F.3d at 707 (stating that a court should consider (1) the merits of an involuntary petition, (2) the role of any improper conduct on the part of the alleged debtor, (3) the reasonableness of the actions taken by petitioning creditors, (4) the motivation and objectives behind filing the petition, and (5) other material factors the court deems relevant); Legacy Real Estate Invs., LLC v. Miller (In re Miller), 2012 U.S. Dist. LEXIS 40921, at *33 (N.D. Ok. Mar. 26, 2012) (same).

Finally, after applying this test, courts not only have discretion to award fees and costs to the debtor, the court also has the discretion to "hold all or some petitioners jointly or severally liable for costs and fees, to apportion liability according to petitioners' relative responsibility or culpability, or to deny an award against some or all petitioners, depending on the totality of the circumstances." Maple-Whitworth, 556 F.3d 742, 746 (9th Cir. 2009); Legacy Real Estate Invs., 2012 U.S. Dist. LEXIS 40921, at *33-34; Rosenberg, 471 B.R. at 317 (citing In re Southern California Sunbelt Developers, Inc., 608 F.3d 456 (9th Cir. 2010); In re Ross, 135 B.R. 230, 240 (Bankr. E.D. Pa. 1991)).

The court hereby adopts the "totality of the circumstances" test, together with the rebuttable presumption, as the appropriate standard for determining whether Quantum Cool is entitled to attorney's fees and costs, and if so, the reasonableness of such fees and costs. Therefore, because the petition is being dismissed on grounds other than by the parties' consent, Quantum Cool's request for fees and costs raises a rebuttable presumption that such fees and costs are authorized. Quantum Cool must specify the amount of fees and costs requested and has the burden of demonstrating reasonableness of that amount. The Petitioning Creditors must then be given an opportunity to satisfy its burden of demonstrating that, under the totality of the circumstances, the request for fees and costs should be disallowed.

Based on the foregoing reasoning, the involuntary petition is hereby **DISMISSED**. Quantum Cool's request for punitive damages is **DENIED**. Regarding Quantum Cool's request for attorney's fees and costs, counsel for Quantum Cool shall file and serve on the Petitioning Creditors an affidavit setting forth the amount of fees and costs requested and the basis for such request within fourteen days from the date of this order. The Petitioning Creditors shall have fourteen days from

the date of the filing of Quantum Cool's affidavit to respond.  The clerk of court shall thereafter schedule a hearing on this matter, during which the court will determine whether and to what extent fees and costs will be allowed against the Petitioning Creditors.

**SO ORDERED.**

**END OF DOCUMENT**